UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

UNITED STATES OF AMERICA    .    Criminal No. 1:19cr334-4
                          .
     vs.                .    Alexandria, Virginia
                          .    January 19, 2021
ERIC YONG WOO,           .    10:28 a.m.
                          .
           Defendant.    .
                          .
. . . . . . . . . . .

TRANSCRIPT OF ARRAIGNMENT/MOTION HEARING
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE
(Via VTC/ZoomGov Videoconference)

APPEARANCES:

FOR THE GOVERNMENT:           DAVID A. PETERS, AUSA
                          United States Attorney's Office
                          2100 Jamieson Avenue
                          Alexandria, VA 22314

FOR THE DEFENDANT:           PATRICK A. MULLIN, ESQ.
                          The Law Offices of Patrick A. Mullin
                          45 Rockefeller Plaza, Suite 2000
                          New York, NY 10111

OFFICIAL COURT REPORTER:           ANNELIESE J. THOMSON, RDR, CRR
                          U.S. District Court, Third Floor
                          401 Courthouse Square
                          Alexandria, VA 22314
                          (703)299-8595

(Pages 1 - 19)

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

<pre>
 1                    P R O C E E D I N G S

 2                         (Defendant present via VTC video.)

 3             THE CLERK:  Criminal Case 19-334-4, United States of

 4   America v. Eric Yong Woo.  Would counsel please note their

 5   appearances for the record.

 6             MR. PETERS:  Good morning, Your Honor.  David Peters

 7   for the United States.

 8             THE COURT:  All right, Mr. Peters.

 9             And for the defendant?

10             MR. MULLIN:  Your Honor, good morning.  I'm Patrick

11   Mullin, appearing on behalf of Mr. Woo.

12             THE COURT:  All right.  And Mr. Woo is here by Zoom.

13   I want to know, Mr. Woo, whether you have any objection to

14   appearing remotely today.

15             Mr. Woo, we can't hear you.  There's no sound.

16             THE DEFENDANT:  No.

17             THE COURT:  No, all right.

18             THE DEFENDANT:  No.

19             THE COURT:  And, counsel, have you discussed with

20   your client his right to be in person in the courthouse?

21             MR. MULLIN:  Yes, Judge.  We spoke by phone a few

22   days ago, and he was aware of that, and he has no objection to

23   proceeding in this fashion.

24             THE COURT:  All right, that's fine.

25             Then let me ask you, counsel, have you had a chance
</pre>

1   to go over the indictment yourself?

2           MR. MULLIN:  Yes, I have, Judge.

3           THE COURT:  And to review the indictment with your

4   client?

5           MR. MULLIN:  Yes.  Again, we discussed it a few days

6   ago.  Yes.

7           THE COURT:  Do you wish to have a formal or an

8   informal arraignment?

9           MR. MULLIN:  Judge, we waive a reading of the

10  indictment, Judge.

11          THE COURT:  I assume you're entering a plea of not

12  guilty?

13          MR. MULLIN:  Yes, we are.

14          THE COURT:  And are you requesting a trial by the

15  bench or by a jury?

16          MR. MULLIN:  By jury, Your Honor.

17          THE COURT:  All right.  As I'm sure Mr. Peters has

18  explained to you, we've previously found that this case does

19  qualify as a complex case because of the number of defendants,

20  the amount of evidence that is obtained from foreign sources,

21  the need for much of it to be translated.

22          In addition, of course, we're also struggling with

23  the COVID-19 situation, and I'm sure you're aware that the

24  standing general order that's just been issued by the chief

25  judge has postponed any jury trials through the month of

1    February, so we're looking at March as the earliest time in

2    which this case could be set for trial.

3            I believe also, Mr. Peters, is there not a status

4    conference currently set for next Tuesday?

5            MR. PETERS:  There is, Your Honor, and I think the

6    intention was to, I hope, set a trial date at that, at that

7    conference, and so insofar as today's hearing is concerned,

8    perhaps we could reserve setting a trial date today in lieu of

9    next week.

10           THE COURT:  We have to do that because there are

11   multiple defendants; and therefore, we have to set the trial

12   date when all defendants can be present.  We'll most likely

13   have to decide how we do that.  It probably will be done

14   remotely again because of the number of defendants.  Some are

15   in Alexandria, and some are at Warsaw.  I don't know if any are

16   at Rappahanock, but we have people spread out among various

17   prisons, in part because of the COVID situation.

18           Is there any objection to proceeding in that fashion?

19           MR. PETERS:  Not from the government.

20           MR. MULLIN:  Not from the defendant, Judge.

21           THE COURT:  All right.  So then it's scheduled, I

22   believe, for 10:00 next Tuesday; is that right?  If not, it

23   probably needs to be at 10:00 because my understanding is we

24   can't do any videoconferences -- that may be a problem.

25           How many defendants are left in this case at this

1  point, Mr. Peters, besides Mr. Woo?  I know we have Mr. Li.

2  Now, who else do we have?

3          MR. PETERS:  Not counting Mr. Woo, Your Honor, in

4  custody right now there are four defendants, and one remains a

5  fugitive.

6          THE COURT:  All right.  So we have a total of five

7  defendants that need to be present at the arraignment next week

8  or the trial, the trial-setting date -- status conference next

9  week.

10          MR. PETERS:  That's correct, Your Honor.

11          THE COURT:  Yeah.  We're going to have to look at

12  what time we do that, all right?  As I said, I know the jail

13  cannot do VTC -- Alexandria Jail cannot do VTC before 10:00.

14  Because Mr. Woo is at Northern Neck, I think they start even

15  later, and I currently have an 11:00 civil matter.  So I'm not

16  yet sure what time on the 26th, counsel, we'll be able to set

17  this.  We'll let you know as soon as we've worked it out.

18          Are you pretty much available all day on the 26th?

19          MR. MULLIN:  Your Honor, I am.

20          THE COURT:  All right.  That's fine, Mr. Mullin.  I'm

21  sure Mr. Peters is.  I'm not worried about that.

22          So just be on standby.  We're going to have to

23  coordinate this with several other attorneys.  If you haven't

24  already been in touch with some of the other attorneys, you

25  ought to try to, you know, communicate with them.

1          Let me take care of a couple of other preliminary

2    matters.  Mr. Woo, I want to repeat what I believe Judge

3    Anderson already did with you but explain to you that under

4    Federal Rule of Criminal Procedure 5(f) and the Due Process

5    Protections Act, I am advising the government that it must

6    adhere to the disclosure obligations set forth in *Brady v.*

7    *Maryland* and --

8          THE DEFENDANT:  I can't hear.

9          THE COURT:  I'm sorry?

10         THE DEFENDANT:  I just interrupted.  I cannot hear

11    what you said before.

12         THE COURT:  We'll try again.  I'm re-advising you of

13    the matters which Judge Anderson explained to you during your

14    earlier hearings last week, and that is, that under Federal

15    Rule of Criminal Procedure 5(f) and the Due Process Protections

16    Act, the government is required to disclose to you all

17    information that's required under *Brady v. Maryland* and its

18    progeny, and that case, *Brady v. Maryland*, requires the

19    government to provide any possible exculpatory evidence, any

20    evidence that might tend to show that you are innocent of the

21    charge or which might assist in your sentencing situation.

22         Do you understand that?

23         THE DEFENDANT:  Yes.

24         THE COURT:  All right.  And if the government fails

25    to comply with that requirement, it could result in serious

1  consequences, including vacating any conviction that might

2  occur as well as disciplinary action against the prosecutors.

3          Do you understand that?

4          THE DEFENDANT:  Yes.

5          THE COURT:  All right.  I also have in court a

6  protective order which has been, as I understand it,

7  Mr. Mullin, agreed to by you on behalf of your client as well

8  as a discovery order.  Is that correct?

9          MR. MULLIN:  That is correct, Judge.

10         THE COURT:  All right.  So both of those -- all of

11  those orders will be entered this morning.  All right.  I've

12  made a finding that this is a complex case.

13         The last issue, I believe, that's on the agenda is

14  your motion for reconsideration of the bond situation.  The

15  magistrate judge in California who did the initial appearance

16  for your client and the initial detention hearing found that

17  your client posed a significant risk of flight.

18         THE DEFENDANT:  I can't hear anything.

19         THE COURT:  You can't hear again?  Mr. Woo, you can't

20  hear?

21         THE DEFENDANT:  Yeah, I can't hear.

22         THE COURT:  All right.  The last issue we have to

23  look at today is your motion for the Court to reconsider the

24  detention order that was entered in California.

25         THE DEFENDANT:  Um-hum.

1          THE COURT:  Did you hear that?

2          THE DEFENDANT:  Yeah, I heard it.

3          THE COURT:  All right.

4          THE DEFENDANT:  I just heard that.

5          THE COURT:  All right.  The magistrate judge in

6    California found that there is no condition or set of

7    conditions of release that would reasonably assure your

8    appearance in this district for further court proceedings.

9    Today I can conduct a de novo review of that decision.  I have

10   read all the papers that have been submitted -- did you hear

11   that?

12         THE DEFENDANT:  I just hear whatever you said, you

13   reconsider the motion in California.

14         THE COURT:  I can reconsider it.  So, Mr. Mullin,

15   you've seen the government's response to your motion in which

16   the government points out that your client has used or

17   attempted to use fake identification, and they've sent the

18   Court a copy of this People's Republic of China passport in the

19   name of Nan Li.

20         Do you want to address that?

21         MR. MULLIN:  Certainly, Judge.  In terms of the

22   government's position, a couple of things.  First of all, at

23   worst, the government's position is that my client was a

24   courier, that is, someone who carried money for folks that were

25   up to no good, Judge, and while one of the factors that is

1  considered under the bail statute is the weight of the evidence

2  against somebody, here this is not someone who is alleged to be

3  a leader of any organization, someone who is involved in drug

4  trafficking, as the other defendants are, so I think that

5  factor weighs towards giving bail to my client.

6          In terms of the actual passport, my understanding of

7  the name on that passport, that that name, Nan Li, is something

8  that my client had going back to China when he was a third

9  child born in a family where the government only allowed one or

10  two folks.  That was the policy back then in effect, so that

11  that name was one that was given to him back then.

12          The import of the passport itself or any other

13  document that alleges to have been fraudulently put together,

14  I -- we're not in a position in any way to address it

15  otherwise.

16          MR. PETERS:  Your Honor, I'm sorry to interrupt.  I

17  can't hear Mr. Mullin at all.

18          THE COURT:  Yeah.  Mr. Mullin, you're going in and

19  out.  What are you -- what are you using to communicate with

20  us?

21          MR. MULLIN:  An iPad.

22          THE COURT:  That may be the problem.  Your voice is

23  coming and going.  I'm not sure even if my court reporter has

24  been able to get all of it, but --

25          MR. MULLIN:  Do you want me to call in, Your Honor?

1          THE COURT:  Right now, what you just said was crystal

2    clear.  Maybe just don't move.  Freeze yourself in position,

3    and keep talking where you are.  Maybe that will solve the

4    problem.

5          MR. MULLIN:  Okay.  Let's try it again.

6          THE COURT:  All right.

7          MR. MULLIN:  All right.  Your Honor, as to the

8    passport itself, the name on that passport -- can you hear me?

9          THE COURT:  Yeah.

10          MR. MULLIN:  Okay.  The name on that passport is a

11    name that I am advised was given to my client at birth with

12    regard to the policy in China where only one or two children

13    were allowed to be born, and he is the youngest of a

14    three-children family.  Otherwise, in terms of the actual

15    document itself, at this point, there's not much that I can

16    address that, but I think more importantly, what we're looking

17    to do here is to have bail set for him with a third-party

18    custodian.

19          He would be living with his parents.  He would be

20    living with his wife and his children.  He would be subject to

21    electronic monitoring.  He would be subject to computer

22    monitoring.  There would be every assurance that he's going

23    nowhere.

24          I've already sent an e-mail over to Pretrial Services

25    with a phone number that they can contact his family to verify

1    information with regard to his parents serving as a third-party

2    supervisor.

3         Otherwise, Judge, in reading the government's

4    submission, he is at worst a courier for money.  He's not a

5    leader of any organization.  He's not charged with any kind of

6    drug conspiracy, where there would be a presumption of his, his

7    remaining incarcerated.  According to page 2 of the report from

8    California, the bond report, when he was arrested, he did not

9    have any false documentation on him.

10        Judge, there's every -- and he's also gone through

11   very, very difficult times while incarcerated.  I mean, it's

12   taken over three months to get him to Virginia from California,

13   and during that time, he received COVID-19.  According to the

14   California report, he has Hepatitis B, so he is in that risk

15   category.

16        The government takes the position that he had COVID

17   once; he can't get it again.  Judge, that's not my

18   understanding of how that works.  So he is certainly at risk to

19   get sick again while in jail.

20        And under the circumstances here, Judge, I would

21   submit to you that he is a candidate for the third-party

22   custodian supervision until trial takes place.

23        THE COURT:  Well, one concern I have about the

24   custodians, my understanding is the defendant's parents are

25   both in their seventies, do not speak English, and are

1   essentially dependent upon him.  Those indications would

2   suggest that they would not be the type of custodian who would

3   be able to exercise sufficient control and communicate any

4   issues to probation.

5          And one of the reasons you gave why your client needs

6   to be home is that his wife also does not speak English, and so

7   I don't know how any of those three could be even considered

8   adequate custodians because part of the job of a custodian is

9   to be able to communicate immediately any potential violations

10  that might be occurring.

11         But the second problem as I see this record is that

12  your client has an extensive history of travel, especially to

13  Mexico, to China, and to other countries, and, for example,

14  apparently he has a Chinese passport and he's a Chinese

15  citizen, and were he to go to China, whether we could ever

16  extradite him would be a significant problem.

17         The flight risk, I think, is very real here, and even

18  though your client himself is not charged with a presumption

19  offense, he is included in an indictment that addresses

20  significant international drug dealing, and that his role in

21  this overall operation was to assist with the laundering of the

22  proceeds, which is obviously the fuel that enables the drug

23  business to go on.

24         So although it's not a presumption case, it is a

25  serious one, and the government has in their papers pointed to

1    fairly significant evidence which they argue shows it's a

2    strong case. Your client has been indicted, so that already

3    establishes a minimum level of probable cause to believe that

4    he may have committed the offense for which he is charged.

5         The, the flight risk is the concern that the Court

6    has, and I'm not satisfied that there's any new evidence. If

7    anything, I think the evidence may be stronger that there is

8    this flight risk.

9         But let me hear from Mr. Peters. Mr. Peters?

10        MR. PETERS: Your Honor, I'd like to respond first to

11   a few things that, that Mr. Mullin said. First off, we do not

12   take the position that he can't get COVID again. We take the

13   position that he's had it. The CDC has communicated that those

14   who have had COVID-19 have developed antibodies which would aid

15   in preventing him from getting at least the strain he's already

16   suffered from.

17        We've made significant representations in our, in our

18   pleading with respect to what the Northern Neck Jail is doing,

19   what their current numbers are. We think, you know, while it's

20   not ideal, they have the situation well in hand.

21        To the extent that Mr. Mullin says that the evidence

22   at best shows that Mr. Woo is a courier, I think that's a

23   misrepresentation as well of what we've alleged at least in

24   this pleading. We've set forth evidence that we intend to

25   prove at trial that he helped courier money on that occasion.

1          Also, the travel to Suriname, we intend to prove,

2   one, happened; we intend to prove the reason for the travel;

3   and we intend to prove that in the broader role of conspiracy,

4   that the use of false identities, false travel documents loom

5   large in the way that this group of, of codefendants

6   perpetrated their crime.

7          So I think it's not entirely accurate to say that his

8   involvement is merely as a courier.  He indeed couriered money,

9   and we're going to prove that.  He did other things as well

10  that are directly related to the conspiracy.  I think his level

11  of culpability goes considerably further than what Mr. Mullin

12  has represented.  And, you know, I think once we have an

13  opportunity to provide discovery, we can properly hear

14  (inaudible).

15          As far as, you know, the existence of a third-party

16  custodian, as the Court pointed out, the proposed custodians

17  are 70, don't speak English, are not from this country, and are

18  simply not acceptable, but we would take the position that

19  nobody would be acceptable.

20          If the Court were to allow Mr. Woo to return to Los

21  Angeles, mere miles from the Mexico border, the amount of

22  border crossings that I understand Mr. Woo has had just simply

23  between the United States and Mexico suggests that it would be

24  simple for him to border that -- to say he had business

25  interests and disappear, and our, our ability to extradite

1    defendants from Mexico is not, is not zero, but it's not easy,

2    and there's a significant opportunity that he could escape to

3    Mexico and never come back, and if he were to get out of Mexico

4    and into someplace like China, then I think our chances for

5    ever expediting him are practically zero at that point.

6             He has no ties to this area.  There's nobody here who

7    could supervise him.  So ostensibly, by releasing him to the

8    custody of the third-party custodian, we would be consenting to

9    him returning to southern California, where, one, he committed

10   a significant portion of criminal activity; and two, that as I

11   stated, he could easily escape out of the country, and we would

12   stand no chance of ever retrieving him and bringing him back,

13   back before this Court.

14            Also, as the Court pointed out, although Mr. Woo is

15   not charged in Counts 1 or 2 of this conspiracy, the evidence

16   is going to amply demonstrate that the money involved is the

17   government's, and although the defendant is not charged in the

18   (inaudible), I think what we're going to show is that there is

19   significant evidence that he knew that.  Whether that becomes

20   an issue at, you know, potentially at sentencing would be

21   something for the Court's consideration.

22            So again, the nature of the conduct, the breadth of

23   the evidence, the risk of flight, the connection with

24   transnational criminal organizations, the use of -- the

25   prolific use of false identities, I think all militate in favor

1   of continued confinement in this case pending trial.

2           THE COURT:  All right.  Well --

3           MR. MULLIN:  Judge, could I be heard?

4           THE COURT:  Go ahead.

5           MR. MULLIN:  Thank you, Judge.  First, in terms of

6   the age of Mr. Woo's client, I would submit that being in your

7   seventies does not mean that you cannot be effective.  Having

8   been someone who just turned 71, you know, people who are in

9   their seventies can still be active and vigilant and so forth,

10  so I don't think that's really a factor.

11          Secondly, in terms of the communication as to

12  Mr. Woo, there is at least one family member who I've spoken to

13  who, who could remain available should any issues arise to

14  serve as kind of a liaison to the Probation Department or

15  Pretrial Services, and we certainly could look to set something

16  up like that if that were to arise.

17          And I think the flip side is he's going to be living

18  not only with his parents but with his wife and his children.

19  I mean, here's someone who will have no incentive to leave all

20  of that, to leave, especially if the parents take seriously, as

21  they will, their obligation here to serve as the custodian.

22          In terms of the border issue, Los Angeles is not on

23  the Mexico border.  If it was San Diego, that would be closer,

24  but Los Angeles is not.  And the reality of today's world is

25  that it is getting tougher and tougher for folks to travel from

1   one country to another.  I know China has imposed great

2   barriers for folks traveling over there.  So it's not as it was

3   before the pandemic.  That's an issue that arises as well.

4          And I, and I would submit to Your Honor that the

5   reasons for allowing him, him being my client, to be in this,

6   it would be like a cocoon that he would be in -- I mean, he's

7   going to have electronic monitoring; he's going to have

8   computer monitoring; he's going to have folks who are

9   responsible -- outweighs any of these other factors raised

10  here.

11         So again, I would ask Your Honor under those

12  circumstances to allow him to, to -- for bail under these

13  circumstances that I've laid out.

14         THE COURT:  All right.  Well, counsel, I've heard the

15  arguments of all of you, and I've looked at the papers, and I'm

16  not satisfied -- I'm satisfied that the government has more

17  than met its burden in this case, where there is already a

18  probable cause finding that supports the charge in the

19  indictment, that no condition or set of conditions of release

20  would reasonably assure the appearance of the defendant in this

21  district for the trial or any other court proceedings.

22         I am not satisfied that because of the extreme amount

23  of international travel which this defendant has and the nature

24  of the offense and the allegations -- I recognize you've

25  offered an explanation but I don't -- I'm not satisfied it's

1    sufficient -- that this passport, which is apparently not in

2    his true name, has an innocent explanation.  Plus, the

3    government has indicated that the use and one of the modus

4    operandi of this operation was to use falsified identification.

5            In my view, that makes the defendant a flight risk,

6    and therefore, I am denying the motion.  And we'll see you-all

7    sometime next week for an arraignment, and we'll try to get you

8    a trial date as soon as possible, but I -- because some of the

9    defendants in this case have been in custody over a year.

10           At the same time, because -- until this virus gets

11   under control, we are limited even when we do begin jury trials

12   to how we can try them.  In other words, we can't try multiple

13   trials at a time in this courthouse, especially a

14   five-defendant case, and so I cannot guarantee you that

15   there'll be a trial in the near future, unlike it was in the

16   pre-COVID era.  We'll do the best we can to get you a

17   reasonably early trial date, but I wouldn't expect anything too

18   soon.

19           So that concludes this proceeding.  We'll see you-all

20   some point next week.  Thank you.

21           MR. PETERS:  Thank you, Your Honor.

22           THE COURT:  Thank you.

23                         (Which were all the proceedings

24                          had at this time.)

25

1                    CERTIFICATE OF THE REPORTER

2          I certify that the foregoing is a correct transcript of

3     the record of proceedings in the above-entitled matter.

4

5

6                                         /s/
                                   Anneliese J. Thomson
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25