IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| v. | ) Case No. 1:19cr334 |
| TAO LIU, | ) |
| Defendant. | ) |

**DEFENDANT'S POSITION ON SENTENCING FACTORS**

Pursuant to Rule 32 of the Federal Rules of Criminal Procedure, Section 6A1.3 of the United States Sentencing Guidelines ("Guidelines"), and this Court's Policy Regarding Procedures to be Followed in Guideline Sentencing, the Defendant, Tao Liu, through counsel, states that he has received and reviewed the Presentence Investigation Report ("PSR") prepared in this case.

On April 14, 2021 Mr. Liu entered a guilty plea to Conspiracy to Commit Money Laundering and Bribery.

According to the submitted PSR, Mr. Liu's total offense level is twenty-seven (32), his criminal history category is I, and his guideline range is between 97 -121 months.

For the reasons set forth below, Liu submits that a variant sentence of not more than thirty six (36) months of incarceration is sufficient to meet the aims of sentencing.

**I. OBJECTIONS/CORRECTIONS TO PSR**

In Paragraph 28 and 54 the report discusses that the defendant and X. Li worked together to start to launder money in Mexico and Guatemala. This is incorrect and not supported by any facts of the case. The defendant did not work to launder money in Guatemala. The Government is willing to concede that this was not a part of the agreed upon statement of facts and that it may be proper to remove the mention of Guatemala.

Paragraph 103 of the PSR states the report discusses the defendant suffered from dental pain while at the Alexandria Detention Center. He denies complaints of dental pain, and believes the medical records saying such are in error, and perhaps pertain to another inmate.

## II. APPLICATION OF U.S.C. §3553(a) FACTORS

In United States v. Booker the Supreme Court ruled that its Sixth Amendment holdings in Blakely v. Washington, 124 S.Ct. 2531 (2004) and Apprendi v. New Jersey, 530 U.S. 455 (2000) applied to the Federal Sentencing Guidelines. United States v. Booker, 125 S.Ct. 738, 756 (2005). The Court further held that the provisions of the Federal Sentencing Reform Act of 1984 that make the Guidelines mandatory or which rely upon the Guidelines' mandatory nature, were incompatible with its Sixth Amendment holding. Booker, 125 S.Ct. at 756. As a result, the Court severed and excised those provisions, "mak[ing] the Guidelines effectively advisory." 125 S.Ct. at 757.

Largely as a result of the Supreme Court's more recent sentencing pronouncements in Gall v. United States, 128 S.Ct. 586 (2007) and Kimbrough v. United States, 128 S.Ct. 558 (2007), the sentencing options available to district court judges have "significantly broadened." United States v. Moon, 513 F.3d 527, 544 (6th Cir. 2008), quoting Gall, 128 S.Ct. at 602. District courts are now free from any requirement that they mechanically adhere to the tight strictures of the guidelines, nor are courts required to even presume that the guidelines provide an appropriate sentence in a given case.

Recognizing that the guidelines are simply the "starting point" in a sentencing analysis, district courts must delve deeper, and make an "individualized assessment based on the facts presented." Gall, 128 S.Ct. at 597. In making an individualized assessment, the district court is required to consider all of the factors outlined in 18 U.S.C.A. §3553(a), and is permitted to tailor the sentence in light of other statutory concerns. Kimbrough, 128 S.Ct. at 570. A district court may reasonably determine that a within guidelines sentence does not serve the objectives of sentencing, even if that determination ultimately rests on a disagreement with the guidelines. Kimbrough, 128 S.Ct. at 564. See United States v. Pugh, 515 F.3d 1179, 1190-91 (11th Cir. 2008).

In the final analysis, the goal of performing an individualized sentencing assessment is to arrive at a just sentence, one "sufficient, but not greater than necessary," 18 U.S.C.A. §3553(a), to serve the purposes of sentencing set forth in §3553(a)(2). United States v. McBride, 511 F.3d 1293, 1297 (11th Cir. 2007). The sentencing court is "free to conclude that the applicable guideline range gives too much or too little weight to one or more factors, either as applied in a

particular case or as a matter of policy." United States v. Campos-Maldanado, 531 F.3d. 337 (5th Cir. 2008).

A district court must give respectful consideration of the guidelines in determining a sufficient sentence, Gall, 128 S.Ct. at 594, but it may not presume that the guideline sentence is the correct one. Rita v. United States, 127 U.S. 2456, 2465 (2007). The court is free to consider whether the guideline sentence itself "fails to properly reflect §3553(a) considerations" in the case at hand, Rita, 127 S.Ct. at 2465, and/or whether the guidelines at issue exemplifies the Sentencing Commission's "exercise of its characteristic institutional role." Kimbrough, 128 S.Ct. at 575.

The offenses for which Mr. Liu stands convicted do not mandate a minimum sentence of imprisonment. Congress not only envisioned, but accepted, the possibility that some defendants in Mr. Liu's position would receive no jail time at all. In short, this is not a mandatory minimum. As the guidelines are now advisory, this court is not constrained from imposing an individualized sentence that does not exceed the statutory ceiling.

In Kimbrough v. United States, 128 S. Ct. 558 (2007), the Supreme Court held that the Sentencing Guidelines are simply an advisory tool to be considered alongside other statutory factors detailed in 18 U.S.C. §3553(a). Courts must consider the recommended guideline range as one of seven co-equal statutory sentencing factors referenced in 18 U.S.C. §3553(a). *United States v. Booker*, 543 U.S. 220, 259-60 (2005). The factors to be considered are: (a) the nature and circumstances of the offense and the history and characteristics of the defendant, (b) the kinds of sentences available, (c) the guideline range, (d) the need to avoid unwarranted sentencing disparities, (e) the need for restitution, and (f) the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, to provide for just punishment for the offense, to afford adequate deterrence, to protect the public from further crimes of the defendant and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment. *See* 18 U.S.C. §3553(a). After considering these factors, the Court has discretion to differ with the U.S.S.G.'s custody range, See Rita v. United States, 127 S. Ct. 2456 (2007). Furthermore, the sentencing courts must impose the minimum sentence that is sufficient to accomplish the objectives of §3553(a). A sentence of no more than sixty (60) month is appropriate following a consideration of the 3553(a) factors.

A. **The Nature and Circumstances of the Offense**

Mr. Liu entered a guilty plea to Conspiracy to Commit Money Laundering and Bribery. The two offenses involved Mr. Liu's interaction with different parties.

Mr. Li is the primary subject of the Government's prosecution of the aforementioned Conspiracy. Mr. Li and Mr. Liu met in Mexico. The meeting did not entail any discussions of laundering money through intricate schemes. At the time, Mr. Liu was moving around the world and was seeking to obtain travel and citizen documents. Mr. Li told him that he could assist him. This did not occur and Mr. Liu and Mr. Li parted ways. The two would cross paths a few more times over the years, but most of their dealings involved gambling or discussion of citizenship documents.

Mr. Liu was subsequently informed of Mr. Li's Money Laundering scheme, and it was also foreseeable to him that the money was coming from illegal activity. At one point, Mr. Li reached out to Mr. Liu to assist him in obtaining funds that had been seized by the United States in Florida. Mr. Liu agreed, but actually did not take any steps to assist Mr. Li's efforts.

Mr. Liu's involvement with the money laundering conspiracy comes down to one occasion in which he was in need of United States currency. He knew that Li, through his money laundering scheme had access to the currency. Mr. Liu reached out to Mr. Li and arranged to receive United States currency in Los Angeles California(where he was staying at the time). Mr. Liu was aware of Mr. Li's criminal enterprise and was fearful of conducting the transaction. He was so fearful that he did not give Li the address to the location he was residing at. Despite his hesitation, he completed the transaction because he needed the funds.

The transaction and subsequent laundering of the funds did not go smoothly. This is because Mr. Liu was unfamiliar the intricate process of Li's criminal activity. His inexperience resulted in the delay of Mr. Li receiving the money transfer in China. Text messages exchanged

between the two reveal Mr. Li's frustration with Mr. Liu. In response Mr. Liu explained that he was trying to learn the process. His response was unacceptable and Mr. Li threatened to bring him to Mr. Liu. The money was subsequently transferred, which completed the laundering process. This was the one and only time that Mr. Liu contacted money laundering transfers. The amount was approximately $100,000. Mr. Liu never had any direct contact with drug traffickers, nor did he know any specific details of Mr. Li's involvement with drug traffickers. His knowledge was based on generalized second hand information, and assumptions made from his conversations and interactions with Li. It was foreseeable that some, if not all, of the funds that Mr. Li was laundering came from narcotic sales.

Mr. Liu's involvement with the bribery offense is centered around his communications with an undercover federal agent. The agent obtained Mr. Liu's contact information from a search warrant executed on another person's phone. He contacted Liu via cellphone and introduced himself as a friend of Mr. Li. Mr. Liu told the agent that he had not spoken nor seen Mr. Li in years, but agreed to assist the undercover officer.

After the initial phone call, Mr. Liu and the undercover agent commenced a series of conversations that spanned over several months. The two would spend hours on the phone discussing multiple topics. Mr. Liu spent a great majority of the conversations exaggerating his background, knowledge of schemes, and past activity. The relevant portion of the conversations dealt with Mr. Liu and the undercover law agent discussing a way to obtain actual united states passports. The undercover officer told Liu he had a source that could manufacturer real passports in exchange for money. The undercover officer told Liu that it would cost him $150,000 per passport. Mr. Liu agreed to the price and ordered two passports over the span of two months. One passport was for Mr. Liu and the other was for a friend. It is important to note that he only

transferred $10,000 out of the required $300,000 to the undercover officer. Although the Parties agreed that Mr. Liu agreed to pay $150,000 for each passport, it seems doubtful that this amount would have actually been paid. One reason for this doubt was Mr. Liu's lack of access to United States currency. He was attempting to use crypto currency. Mr. Liu never received the passports and was subsequently arrested in Guam. Mr. Liu never attempted to directly communicate with the "corrupt" State Department official. He only spoke to the undercover agent about the scheme.

### B. The History and Characteristics of the Defendant

Mr. Liu is 45 years old. Prior to his arrest, Mr. Liu was residing in Hong Kong. He was born in Zhe Jiang, China. Mr. Liu is the youngest child of his parents Shaolai Liu and Shufen Jin. He had a normal up brining, but his relationship with his parents has always been distant. His father was a business man in China and was rarely home. In addition, his parents sent him to school in Shanghai and he was rarely at the family home to establish a bond with his mother or siblings.

Mr. Liu's relationship with his family was strained even further after his father was kidnapped in China. Mr. Liu spoke to the assailants, who demanded ransom payments, on behalf of the family. Although Mr. Liu's father was subsequently released, he was angry with Mr. Liu's handling of the negotiation process. His father's anger did not subside and he ultimately terminated communication with Mr. Liu. He has not spoken with his parents in over ten (10) years.

After reaching adulthood, Mr. Liu spent a lot of time traveling the world. He has spent time in various countries and has worked on business development and investments.

Throughout his life, Mr. Liu's has had issues maintaining long term relationships and commitments. He has had several women in his life and has had children with many of them. Although he keeps in contact with some of the mothers, others he has little contact with. Despite

this, he has continued to provide them with support for his children. He maintains regular communication with some of his children, but not all. Mr. Liu's inability to maintain relationships with women and children is a reflection on his lack of interaction with his parents as a child. The value he places on relationships and how one should act toward loved ones is not healthy. He agrees that he should seek counseling to address these issues.

Mr. Liu is not in great health. He suffers from multiple chronic medical conditions. He is a pre-diabetic, suffers from heart ailments, and low blood pressure. Fortunately, he has no history of mental health issues nor drug abuse.

There is currently a "red notice" or international warrant for Mr. Liu's arrest for allegations levied against him by the People's Republic of China. Mr. Liu maintains that this warrant is the result of government corruption, and he has a pending application for Asylum with the United States State Department. He understand that this matter may complicate his application, but he plans on working with an immigration attorney to advocate his position.

C. **The Need for the Sentence to Reflect the Basic Aims of Sentencing: "just punishment," deterrence, and rehabilitation**

Mr. Liu is 45 years old. Prior to this current legal matter. He is a criminal his category I. He has entered a guilty plea to two felony crimes, but the guidelines certainly overstate his involvement in each. A variant sentence of no more than thirty-six (36) months of incarceration is more than enough to accomplish the aims of sentencing.

The bulk of Mr. Liu's guideline calculation for the Conspiracy to Commit Money Laundering are due to a loss amount in excess of $550,000 (+14) and because Mr. Liu should have believed the funds were from the distribution of narcotics (+6). As discussed above, Mr. Liu only laundered funds with Mr. Li on one occasion. The amount was $100,000. Although it was foreseeable that the money was derived from illegal activity, Mr. Liu had no understanding

of the details or knowledge of drug traffickers. As a matter of fact, this made him fearful of Li. Mr. Liu was not versed in the process of the scheme and nearly botched the one transaction he conducted with Mr. Li. Thus, the guidelines, while properly calculated, overstate Mr. Liu's culpability and knowledge of the conspiracy.

The bribery guidelines also overstate Mr. Liu's involvement due to the loss amount. Mr. Liu is being held responsible for a loss amount in excess of $250,000 (+12) for the bribery scheme. This is solely because he agreed in principal to pay a $150,000 bribe for each passport, and he ordered two (2) from the undercover agent. Despite agreeing to the large amount, Mr. Liu only transferred $10,000 to the undercover officer, and never received any passport. This represents a payment of only 3% of the total amount that he is being held responsible for pursuant to the guidelines.

A sentence of thirty-six (36) months will also avoid any unwarranted sentencing disparities. Mr. Liu's co-defendant Jiayu Chen was much more involved in the Money Laundering Conspiracy that Mr. Liu. Chen conducted several financial transactions and received drug proceeds from couriers. Chen was recently sentenced to sixty (60) months in prison.

Co-Defendant George Yu was sentenced to sixty (60) months in prison for his role in the Conspiracy to Commit Money Laundering. Yu's role involved him using a restaurant in California to assist in the money laundering activities. He was also responsible for collecting and personally transporting drug proceeds to Chicago on several occasions.

Co-Defendant Xueyong Wu was sentenced to sixty (60) months in prison for his role in the Conspiracy to Commit Money Laundering. The Government's evidence showed that Wu played a key role in the offense by laundering the money through international banks and casinos.

Mr. Liu's role in the conspiracy was much less involved than the aforementioned individuals. He had little contact with Le and has only completed one transaction. The other individuals completed several transactions and maintained an ongoing role in the criminal activity. The scheme would not be successful, but for there consistent efforts and communication with Li.

In respect to the Bribery offense, the following are sentences that have been given to individuals involved in such conduct.

In 2016, former Virginia Governor Robert McDonnell was sentenced to serve a period of twenty-four (24) months of incarceration after being convicted of eleven (11) felony corruption related offenses. His conviction was ultimately overturned by the United States Supreme Court. Similarly, the prosecutions of the defendants (military officials and defense contractors) in the infamous "Fat Leonard" bribery case. That matter involved over 35 million dollars' worth of bribes. The *Washington Post* called the scandal "perhaps the worst national-security breach of its kind to hit the Navy since the end of the Cold War. The convictions resulted in sentences as low as eighteen (18) months (Admiral Robert Gilbeau), thirty (30) months (Lt. Cmdr. Genry Debord), and forty-six (46) months (Linda Raja). The severity of conduct and amount of loss in that matter dwarfs the figure referenced in Mr. Liu's bribery matter.

**CONCLUSION**

For the reasons stated above, Mr. Liu requests that this court sentence him to a period of incarceration of no more than thirty-six (36) months, recommend that he be placed be housed at a B.O.P. facility as close to Philadelphia, Pennsylvania as possible. It is Mr. Liu's position that this sentence is sufficient to accomplish the objectives of sentencing as detailed in 18 U.S.C. §3553(a).

                                                Respectfully Submitted,
                                                TAO LIU
                                                By Counsel

By:_____/s/_____
  Jonathan A. Simms (VSB 75663)
  The Simms Firm, PLC
  11325 Random Hills Road
  Suite 360
  Fairfax, Virginia 22030
  Ph (703) 383-0636
  (703) 225-3333
  jsimms@simmsfirm.com

## CERTIFICATE OF SERVICE

      I hereby certify that on July 29, 2021 I will electronically file the foregoing pleading with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Mary Daly, Esquire
David Peters, Esquire
Kerry Blackburn, Esquire
Assistant U.S. Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314
(703) 299-3700

By:_____/s/_____
Jonathan A. Simms (VSB 75663)
The Simms Firm, PLC
11325 Random Hills Road
Suite 360
Fairfax, Virginia 22030
Ph (703) 383-0636
(703) 225-3333
jsimms@simmsfirm.com